**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 98-10904
_____


FEDERATED MUTUAL INSURANCE COMPANY

Plaintiff,

versus

GRAPEVINE EXCAVATION INC.; ET AL,

Defendants,

GRAPEVINE EXCAVATION INC.,

Defendant - Third Party Plaintiff - Appellant,

versus

MARYLAND LLOYDS, a Lloyds Insurance Company,

Third Party Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Texas
_____

December 1, 1999

Before JONES and WIENER, Circuit Judges, and WALTER, District
Judge.[*]

WIENER, Circuit Judge:

In this breach of contract and declaratory judgment action
arising out of an insurance defense dispute, Defendant-Third Party
Plaintiff-Appellant Grapevine Excavation, Inc. ("GEI") appeals the

---

[*]District Judge of the Western District of Louisiana, sitting
by designation.

district court's grant of summary judgment in favor of Third Party Defendant-Appellee Maryland Lloyds ("Maryland"). Following a <u>de novo</u> review of the record, we reverse and render judgment in favor of GEI, but remand the case to the district court for a determination of the appropriate remedy. In addition, we retain jurisdiction for the limited purpose of deciding whether GEI is entitled to recover the attorney's fees incurred in this case, a question that we have certified to the Supreme Court of Texas.

**I**

**FACTS AND PROCEEDINGS**

The present controversy arises out of a suit filed by Tribble & Stephens, Co. ("T&S") against GEI and various other defendants. T&S, a general contractor, was hired by Wal-Mart to construct a parking lot at its store in Burleson, Texas. T&S subcontracted with GEI to perform excavation, backfilling and compacting work in connection with T&S's construction of the lot.[1]

In August 1995, approximately six months after GEI completed work on the project, Wal-Mart discovered that the select fill materials provided and installed by GEI failed to meet specifications and, as a result, had caused damage to the work of

---

[1]T&S agreed to pay GEI $666,000 for its work under the subcontract. To guarantee GEI's performance, Employers Mutual Casualty Co. ("EMCASCO") furnished a subcontract bond to T&S for this amount. In doing so, EMCASCO agreed to indemnify T&S against all expenses incurred as the result of GEI's failure to meet the requirements and specifications of the subcontract.

T&S's paving subcontractor, Moore Construction, Inc. ("Moore"). Although Wal-Mart initially contemplated requiring T&S to correct the deficiency by installing an asphalt overlay on the lot, it ultimately opted to withhold from T&S partial payment of the balance due under its construction contract.

Thereafter, T&S filed suit in state court against GEI.[2] In that suit T&S sought a declaratory judgment on the issue of GEI's financial responsibility for damage to the parking lot, and alleged claims of breach of contract, negligence, and violations of the Texas Deceptive Trade Practices Act ("DTPA").

On being named a defendant in the T&S litigation, GEI called on its commercial general liability insurance ("CGL") carriers, Federated Mutual Insurance Company ("Federated") and Maryland, to provide a defense. Federated acquiesced in the demand, subject to a reservation of its rights, but Maryland refused. Thereafter, Federated filed this declaratory judgment action in federal district court in Texas seeking a determination of its obligations under its policy. GEI counterclaimed against Federated and filed a third-party complaint against Maryland alleging breach of contract and seeking declaratory judgment that Maryland had a duty to defend.

The parties filed cross motions for summary judgment and the

---

[2]Also named as defendants in T&S's suit are EMCASCO (GEI's surety), Moore (T&S's paving subcontractor), and American States Insurance Company (Moore's surety).

3

court ruled in favor of Federated and Maryland, concluding that neither insurer had a duty to defend GEI in the T&S lawsuit. The district court based its ruling, in pertinent part, on a determination that GEI's performance under its subcontract was an intentional act and, therefore, did not constitute an "occurrence" as that term is defined in the Federated and Maryland CGL policies. GEI now appeals, seeking reversal of the district court's grant of summary judgment in favor of Maryland.[3]

## II

## ANALYSIS

### A. Standard of Review

We review a grant of summary judgment de novo, applying the same standard as the district court.[4] Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and shows that the moving party is entitled to judgment as a matter of law.[5]

---

[3]GEI does not appeal the district court's grant of summary judgment in favor of Federated. The Federated policy provided coverage from January 1, 1994 to January 1, 1995; the Maryland policy provided coverage from January 1, 1995 to January 1, 1996. The district court held that there were no allegations indicating that property damage became apparent until after January 1, 1995, i.e., until coverage under Federated's policy had expired.

[4]Melton v. Teacher's Ins. & Annuity Ass'n of America, 114 F.3d 557, 559 (5th Cir. 1997).

[5]River Prod. Co., Inc. v. Baker Hughes Prod. Tools, Inc., 98 F.3d 857, 859 (5th Cir. 1996).

4

## B. Maryland's Duty to Defend GEI

The parties agree that Texas law controls whether Maryland has a duty to defend GEI in the T&S litigation. Texas courts follow the "eight corners" or "complaint allegations" rule in making this determination.[6] Under this rule, courts compare the words of the insurance policy with the allegations of the plaintiff's complaint to determine whether <u>any</u> claim asserted in the pleading is potentially within the policy's coverage.[7] The burden is on the insured to show that a claim against him is potentially within the scope of coverage under the policies; however, if the insurer relies on the policy's exclusions, it bears the burden of proving that one or more of those exclusions apply.[8] Once the insurer proves that an exclusion applies, the burden shifts back to the insured to show that the claim falls within an exception to the exclusion.[9]

Maryland's CGL policy provides liability coverage to GEI for "property damage" caused by an "occurrence." As defined in the policy, "property damage" means "[p]hysical injury to tangible

---

[6]<u>Canutillo Indep. Sch. Dist. v. National Union Fire Ins. Co.</u>, 99 F.3d 695, 701 (5th Cir. 1996).

[7]<u>National Union Fire Ins. Co. v. Merchants Fast Motor Lines, Inc.</u>, 939 S.W.2d 139, 141 (Tex. 1997).

[8]<u>Guaranty Nat'l Ins. Co. v. Vic Mfg. Co.</u>, 143 F.3d 192, 193 (5th Cir. 1998); <u>Canutillo</u>, 99 F.3d at 701; <u>Sentry Ins. v. R.J. Weber</u>, 2 F.3d 554, 556 (5th Cir. 1993).

[9]<u>Guaranty Nat'l Ins. Co.</u>, 143 F.3d at 193.

5

property, including all resulting loss of use of that property." The term "occurrence" means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." The term "accident," however, is not defined. Maryland concedes that the damage to the parking lot constitutes "property damage" within the meaning of its policy. Hence, Maryland's duty to defend turns on (1) whether T&S has alleged in its state court petition that this damage was caused by an "occurrence," i.e., an "accident," and, if so, (2) whether Maryland's policy nevertheless contains one or more exclusions that explicitly eschew coverage of T&S's claims.[10]

### 1. Damage Caused by an "Occurrence"

There are two lines of Texas cases construing the definition of "occurrence" for the purpose of insurance coverage. The first pertains to coverage of claims against an insured for damage caused by its alleged intentional torts. According to this body of law, damage that is the natural result of voluntary and intentional acts is deemed not to have been caused by an occurrence, no matter how unexpected, unforeseen, and unintended that damage may be.[11]

---

[10]GEI's policy covered the period from January 1, 1995 to January 1, 1996. It is undisputed that Wal-Mart's discovery of the construction deficiencies in the parking lot occurred during this policy period.

[11]Argonaut Southwest Ins. Co. v. Maupin, 500 S.W.2d 633, 635 (Tex. 1973)(citing Thomason v. United States Fidelity & Guar. Co., 248 F.2d 417, 419 (5th Cir. 1957)).

6

This principle was first enunciated by the Texas Supreme Court in <u>Argonaut Southwest Insurance Co. v. Maupin</u>.[12]  In that case, Maupin Construction Company sued Argonaut for refusing to defend it in a trespass suit brought by the owner of a parcel of real property from which Maupin had removed dirt pursuant to a contract with the owner's tenant.  Argonaut's policy provided coverage for "injur[ies] to or destruction of property . . . caused by [an occurrence]."[13]  The policy defined "occurrence" as "(a) an accident, or (b) in the absence of an accident, a condition for which the insured is responsible which during the policy period causes physical injury to or destruction of property which was not intended."[14]  Maupin contended that its removal of dirt constituted accidental damage to the owner's property and, as such, fell within the scope of coverage.  The supreme court disagreed.[15]  An actor is deemed to have committed the tort of trespass, reasoned the court, if he intentionally and without the owner's consent enters onto a piece of property, regardless whether he was aware of the property's ownership at the time.[16]  As Maupin voluntarily, intentionally, and without the true owner's consent removed dirt

_____

[12]500 S.W.2d 633 (Tex. 1973).

[13]<u>Id.</u> at 634 n.1.

[14]<u>Id.</u>

[15]<u>Id.</u> at 635.

[16]<u>Id.</u>

from property belonging to the owner, and as trespass in Texas is a strict liability tort without a scienter element, the court concluded that inquiry into whether Maupin expected or intended to cause damage to the owner was not relevant in determining if a tort had been committed.

Both state and federal courts sitting in Texas have relied on Maupin to deny insurance defense and coverage in a steady stream of cases (the "Maupin line"), all of which involve the alleged commission of an intentional tort by an insured.[17] In cases involving claims against an insured for damage arising out of his alleged negligence, however, a second line of cases has developed, following Massachusetts Bonding & Ins. Co. v. Orkin Exterminating

---

[17]See, e.g., State Fire & Cas. Co. v. Brooks, 43 F. Supp.2d 695, 702 (E.D. Tex. 1998) (concluding that a claim brought against an insured for damages resulting from "unconsenting sexual acts" is a claim for damages resulting from an intentional act which is not a covered "occurrence"); Metropolitan Property & Cas. Co. v. Murphy, 896 F. Supp. 645, 648 (E.D. Tex. 1995)(concluding that a woman's claim against Murphy, for secretly watching her shower, bathe, dress, and sleep through holes he had drilled in her bathroom and bedroom walls, was based on allegations of intentional conduct that did not satisfy the policy's definition of "occurrence"); Trinity Universal Ins. Co. v. Cowan, 945 S.W.2d 819, 828 (Tex. 1997)(concluding that a photo lab clerk's intentional act of replicating photographs of a woman and showing them to friends was not an "accident" within the meaning of the clerk's homeowners' liability policy, even though the clerk did not intend to cause harm to the woman, because the injury of which the woman complained — the invasion of her privacy — could be reasonably anticipated from the clerk's conduct); Baldwin v. Aetna Cas. & Sur. Co., 750 S.W.2d 919, 921 (Tex. App. — Amarillo 1988, reh'g denied) (denying plaintiff's claim for damage incurred when his insurer refused to defend him in a suit brought by the state for alleged repeated and intentional highway size and weight violations).

8

<u>Co.</u>[18] (The "<u>Orkin</u> line").

In <u>Orkin</u>, the Texas Supreme Court was called on to resolve an insurance dispute arising out of a suit brought by Gulf Coast Rice Mills against an exterminator for damage to rice caused by the application of pesticide in the rice mill's facilities. A jury in the underlying case found that Orkin had acted negligently in its application of the pesticide in Gulf Coast's premises and that such negligence was the proximate cause of damage to the rice. In the insurance litigation that ensued, the supreme court concluded that the damage for which Orkin had been held liable was caused by an "accident" within the meaning of the applicable insurance policy. In reaching this conclusion, the court construed the term "accident" to "include negligent acts of the insured causing damage which is undesigned and unexpected."[19]

Following <u>Orkin</u>, both state and federal courts in Texas have interpreted the terms "accident" and "occurrence" to include damage that is the "unexpected, unforeseen or undesigned happening or consequence" of an insured's negligent behavior.[20] Many of these

---

[18]416 S.W.2d 396 (Tex. 1967).

[19]<u>Id.</u> at 400; <u>accord</u> <u>Cowan</u>, 945 S.W.2d at 828 (affirming the continuing validity of <u>Orkin</u>'s holding).

[20]<u>See, e.g.</u>, <u>Lafarge Corp. v. Hartford Cas. Ins. Co.</u>, 61 F.3d 389, 395 (5th Cir. 1995)(holding that unintended damage to a pipeline caused by the defective coating supplied by insured's subsidiary was caused by an "occurrence" within the meaning of the liability policy); <u>Hartford Cas. Co. v. Cruse</u>, 938 F.2d 601, 604-05 (5th Cir. 1991)(concluding that extensive damage to plaintiffs' home caused by insured's defectively performed foundation leveling

9

cases have involved claims for damage caused by an insured's defective performance or faulty workmanship.[21] Furthermore, within this genre, courts have consistently held that damage wreaked on the work product of a third party — as opposed to that of the insured[22] — is presumed to have been unexpected and, therefore, constitutes an accident or an occurrence.[23]

services was unexpected and unintended and, therefore, was caused by an "occurrence" within the meaning of the policy); Travelers Insurance Co. v. Volentine, 578 S.W.2d 501, 503 (Tex. App. 1979)(concluding that the destruction of an entire engine as the result of the malfunction of one repaired valve was unexpected and unintended); Employers Casualty Co. v. Brown-McKee, Inc. 430 S.W.2d 21, 24 (Tex. App. 1968)(concluding that manufacturer's alleged improper construction and repair of concrete grain storage elevator was an "accident" for the purposes of insurance coverage and defense because it brought about damage that was "an unexpected, unforeseen or undesigned happening or consequence from 'either a known or unknown cause.'").

[21]See supra note 19.

[22]Maryland's policy, like many general liability policies, does not cover "'property damage' to 'your work' arising out of it or any part of it . . . ." (Emphasis added). A policy containing this type of exclusion — commonly referred to as a "business risk" exclusion — treats differently the risk that an insured's substandard services or supplies will cause damage to his own work product and the risk that his slipshodness will injure someone or something else. Cruse, 938 F.2d at 603.

[23]See, e.g., Lafarge, 61 F.3d at 395(citing Cruse and Volentine for the proposition that "there is an accident or occurrence when the alleged product defect has caused damage to other property"); Cruse, 938 F.2d at 604-05(considering the "business risk" exclusion in tandem with the "occurrence" requirement and noting that, although damage to a builder's own work caused by his breach of contract is a cost of doing business that is not covered by a general liability policy, damage to the work of another is covered); Volentine, 578 S.W.2d at 503-04(discussing the "business risk exclusion" and noting that, although the exclusion eschews coverage of claims against an insured for damage caused by the insured to his own work, it allows coverage for the insured's

In granting summary judgment in favor of Maryland, the district court rejected the applicability of the <u>Orkin</u> negligence line of cases and relied instead on the <u>Maupin</u> line of cases which pertain to intentional torts. On appeal, GEI contends that this decision was improper, and we agree.

The allegations in T&S's state court "Fourth Amended Original Petition" provide the measure for Maryland's defense obligation.[24] In that petition, T&S alleges that the parking lot was damaged as a result of GEI furnishing and installing substandard fill materials. T&S specifically alleges that, six months after GEI completed its work, Wal-Mart tested GEI's materials and found them to have a California Bearing Ratio ("CBR") in the range of 3.7 to 4.9, well below the 15 CBR specified in the subcontract.

Although GEI readily admits that it intentionally performed under the subcontract, it denies that it intentionally substituted inferior materials —— and nothing in the facts alleged by T&S supports a claim of knowing or intentional substitution of inferior fill matter. Indeed, the only allegation of knowing conduct anywhere in T&S's complaint appears within the context of its DTPA claim.

---

liability for damage to other property resulting from the defective condition of his work).

[24]<u>See</u> <u>Rhodes v. Chicago Ins. Co.</u>, 719 F.2d 116, 120 (5th Cir. 1983)(stating that the duty to defend is determined by examining the latest amended pleading on which the insurer based its refusal to defend the action).

It is well settled that an insurer's duty to defend is triggered if at least one of several claims in the plaintiff's complaint potentially falls within the scope of coverage, even if other claims do not.[25] T&S's fourth amended petition alleges that GEI acted negligently — that is, "caus[ed] damage which is undesigned and unexpected"[26] — which, if proved to be true, constitutes an "accident" within the definition ascribed to that term by the Texas Supreme Court. In Paragraph 5 of the Petition, T&S summarizes the property damage to the parking lot caused by the alleged negligence of GEI as follows: ". . . by virtue of failing to install the correct select fill, [GEI] negligently damaged the work of [T&S's] paving contractor, [Moore]."[27] Therefore an "occurrence" is alleged within the four corners of T&S's complaint, and that triggers coverage. As T&S's petition thus includes a claim that has the potential to lead to a covered loss, Maryland has a duty to defend GEI — absent an applicable policy exclusion.

## 2. Maryland's Policy Exclusions

Having concluded that the allegations in the complaint in the underlying suit potentially constitute a covered "occurrence," we must reverse the holding of the district court unless GEI's claim

---

[25]Id. at 119.

[26]Orkin, 416 S.W.2d at 400.

[27]Emphasis added.

12

of coverage is trumped by a policy exclusion.  Maryland urges the court to apply both (1) the "contractual liability" exclusion and (2) the "impaired property" exclusion.  If either exclusion applies, Maryland has no duty to defend.  The District Court disposed of the case on the coverage issue, and therefore never reached the question of the applicability of the exclusions.

### a.    The Contractual Liability Exclusion

The contractual liability exclusion denies coverage for claims arising out of

> b. "Bodily injury" or "property damage" for which
> the insured is obligated to pay damages by reason
> of the assumption of liability in a contract or
> agreement.   This exclusion does not apply to
> liability for damages:
> (1) Assumed in a contract or agreement that is
> an "insured contract" . . .; or
> (2) that the insured would have in the absence
> of the contact or agreement.

This exclusion operates to deny coverage when the insured assumes responsibility for the conduct of a third party.[28]  As GEI is not being sued as the contractual indemnitor of a third party's conduct, but rather for its own conduct, the exclusion is inapplicable.   Moreover, even if the contractual liability exclusion were somehow applicable to situations in which the insured is being sued for its own conduct, the exclusion would not

---

[28]Olympic, Inc v. Providence Washington Ins. Co., 648 P.2d 1008, 1011 (Alaska 1982) (explaining that assumption of liability in a contract "refers to liability incurred when one promises to indemnify or hold harmless another, and does not refer to the liability that results from breach of contract.").

13

apply here.  It is true, as Maryland notes, that under the subcontract between GEI and T&S, GEI agreed to indemnify T&S and hold it harmless for claims arising both from conduct of specified third parties and from its own conduct.[29]  Accordingly, Maryland urges, GEI's alleged liability to T&S is "by reason of the assumption of liability in a contract or agreement" and therefore excluded from coverage.  This indemnity provision is not, however, the only source of GEI's duty to T&S.  Even absent a contractual indemnity provision, GEI would be liable to T&S —— under generally applicable contract law —— for damage caused by GEI's negligent failure to perform its contractual duties according the specifications in the subcontract.[30]  There are, therefore, at least two sources from which GEI's liability to T&S could spring and only

---

[29]The relevant provision of the subcontract provides in pertinent part:

> Subcontractor shall fully protect, indemnify and defend T&S,  . . . and hold [it] harmless from and against any and all claims, demands, causes of action, damages, and liabilities . . . for the destruction of tangible property (other than the work itself) including the loss of use resulting therefrom, arising in any manner, directly or indirectly, out of or in connection with or in the course of or incidental to any work or operation(s) of Subcontractor or T&S . . . .

[30]See, e.g., Sipes v. Langford, 911 S.W.2d 455, 457 (Tex. App. 1995) ("Implicit in every contract is a common-law duty to perform the terms of the contract with care, skill and reasonable experience.  A breach of this duty is actionable in tort."); Tips v. Hartland Developers, Inc., 961 S.W.2d 618, 621 (Tex. App. 1998) (same).

14

one of them could be deemed an assumption of liability.  When, as here, liability could be imposed pursuant to either a contractual indemnity provision or a generally applicable legal principle, the contractual liability exclusion will not bar coverage.[31]  For the forgoing reasons, we conclude that the contractual liability exclusion does not apply.[32]

### b.  The Impaired Property Exclusion

This exclusion denies coverage for claims arising out of

m.  "Property damage" to "impaired property" or property that has not been physically injured, arising out of:

(1)  A defect, deficiency, inadequacy or dangerous condition in . . . "your work;" or

(2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms. . . .

"Impaired property" is defined as

tangible property, other than . . . "your work," that cannot be used or is less useful because:

---

[31]Cagle v. Commercial Standard Ins. Co., 427 S.W.2d 939, 944 (Tex. App. 1968) ("[W]here the express contract actually adds nothing to the insured's liability, the contractual liability exclusion clause is not applicable . . ." (quoting 63 A.L.R.2d 1122)); Aetna Casualty and Surety Co. v. Lumbermens Mutual Casualty Co., 527 N.Y.S.2d 143, 145 (App. Div. 1988) ("[W]here, as here, the insured contractor is liable under either the indemnity provision of its contract or in tort independent of contract, the exclusion for liability assumed under contract will not apply.").

[32]There is an exception to the contractual liabilities exclusion for liabilities assumed in an "insured contract."  The parties disagree as to whether GEI's subcontract falls within the policy definition of "insured contract."  As the contractual liabilities exclusion is inapplicable for the reasons set forth above though, we do not reach this issue.

**a.** It incorporates . . . "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

**b.** You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:
**a.** The repair, replacement, adjustment or removal of . . . "your work;" or

**b.** Your fulfilling the terms of the contract or agreement.

Maryland contends that this provision excludes coverage of claims for damage[33] arising from an insured's failure to perform its contractual duties. GEI agrees to a limited extent, but observes that, in the instant case, T&S has alleged a claim for negligence in addition to breach of contract. Moreover, argues GEI, the impaired property exclusion does not apply because the property damage alleged in T&S's complaint is not damage to "impaired property." This is so, GEI insists, because Moore's asphalt paving cannot be "restored to use" by "the repair, replacement, adjustment or removal" of GEI's underlying defective fill. We agree.

In <u>Action Auto Stores, Inc. v. United Capitol Ins. Co.</u>, Larson (the insured) installed gasoline containment systems on Action Auto's property pursuant to a contract with Action Auto.[34] These

---

[33]Maryland suggests that the type of damage covered by the exclusion clause is "economic loss." According to the language of the clause, however, it is clear that "property damage" is the type of damage covered. Under Texas law, economic damage does not constitute property damage. <u>Gibson</u>, 966 F. Supp. at 474.

[34]845 F. Supp. 417, 419 (W.D. Mich. 1993).

16

containment systems were alleged to have leaked, contaminating the surrounding soil.[35]  When Action Auto sued, Larson sought a defense from its insurer.  The insurer refused to defend Larson, based in part on a policy exclusion identical to the "impaired property" exclusion at issue here.[36]  Applying Michigan law, the court held that the exclusion was not applicable, reasoning that

> no evidence has been presented that any damage done to property surrounding the containment system can be remedied by the repair, replacement, or adjustment of the [insured's] work product.  Furthermore, such a result is illogical as any pollution done to surrounding property could not possibly be rectified merely by the removal of the defective work product.[37]

Similarly here, there has been no suggestion that the damage to the surface of the parking lot can be restored by "the repair, replacement, adjustment or removal of" GEI's underlying work. Neither has there been any contention that by "fulfilling the terms of the contract or agreement" GEI can remedy the alleged defect in Wal-Mart's parking lot.  To the contrary, the only proposed means of repairing the lot is to install an asphalt overlay, leaving both GEI's work and that of the paving subcontractor intact.  Indeed, it is inconceivable that any remedial or supplemental work could be done to GEI's portion of the project, all of which lies underneath the surface, without removing and destroying the paving

---

[35]Id.

[36]Id. at 425.

[37]Id. at 426.

17

subcontractor's work. Therefore, while "property damage" has been alleged, none of the allegations, either alone or in combination, can be construed as a claim that damage was done to "impaired property" as that term is defined in Maryland's policy. Consequently, we conclude that the impaired property exclusion is inapplicable.

C.  **Attorney's Fees**

GEI claims that it is entitled to recover attorney's fees and expenses incurred in pursuing coverage from Maryland in this action, including those incurred on appeal.

Chapter 38 of the Texas Civil Practice and Remedies Code first sets forth the general rule that litigants can recover reasonable attorney's fees incurred in a valid claim on, inter alia, a written contract.[38]  It then lists to following five exceptions:

> This chapter does not apply to a contract issued by an insurer that is subject to the provision of:
>       (1) Article 3.62, Insurance Code [this Article was repealed in 1991];
>       (2) Section 1, Chapter 387, Acts of the 55th Legislature, Regular Session, 1957 (Article 3.62-1, Vernon's Texas Insurance Code) [this Article was repealed in 1991];
>       (3) Chapter 9, Insurance Code;
>       (4) Article 21.21, Insurance Code; or
>       (5) the Unfair Claims Settlement Practices Act (Article 21.21-2, Insurance Code).[39]

In Dairyland Mutual Ins. Co. v. Childress, an insurance company was held liable for its policyholder's attorney's fees by

---

[38]Tex. Civ. Prac. & Rem. Code § 38.001(8).

[39]Id. § 38.006.

18

a state appellate court because the policyholder had successfully pursued an action for breach of an insurance contract.[40] On appeal to the Supreme Court of Texas, the insurance company argued that it was not liable for attorney's fees under the predecessor to Chapter 38 of the Texas Civil Practice and Remedies code because, as an insurance company, it was shielded from liability for attorney's fees by the predecessor to § 38.006. The Texas Supreme Court held that

> Dairyland is a county mutual insurance company and as such is not one of the insurors exempt from the provisions of Art. 2226 [the predecessor to Chapter 38 of the Civil Practice and Remedies Code]. See Tex. Ins. Code Ann. Art. 7.22. Therefore, it is not exempt from a claim for attorney's fees pursuant to Art. 2226.[41]

Texas appellate courts and this court have disagreed as to the significance of this statement. We have interpreted the quoted passage from Dairyland County to imply that "an insurer who falls within the provisions of section 38.006 is exempt from the payment of attorney's fees and that only those insurers who do not qualify for the exemption are subject to the payment of attorney's fees."[42] By contrast, Texas appellate courts have held that no such implication was intended, and that, consistent with the decision of

---

[40] 636 S.W.2d 282, 284 (Tex. App. — Eastland, 1982).

[41] Dairyland County Mutual Ins. Co. v. Childress, 650 S.W.2d 770, 774 (Tex. 1983).

[42] Bituminous Cas. Corp. v. Vacuum Tanks, Inc., 975 F.2d 1130, 1133 (5th Cir. 1992); see also Lafarge Corp. v. Hartford Cas. Ins. Co., 61 F.3d 389, 402-03 (5th Cir. 1995).

19

the court in <u>Prudential Ins. Co. v. Burke</u>,[43] the purpose of the exceptions now codified at § 38.006 is "to exclude only those claims against insurance companies where attorney's fees [are] already available by virtue of other specific statutes."[44]

Given these divergent interpretations of <u>Dairyland County</u> and the less-than pellucid provisions of the Texas Code that bear on this issue, we conclude the most principled solution to the issue is to ask the Supreme Court of Texas, by certified question, to explain the proper interpretation of Chapter 38 of the Texas Civil Practice and Remedies Code as they apply to the facts of this case. We retain jurisdiction over this appeal for the limited purpose of implementing the answer, if one is forthcoming; or, if no answer is supplied, then for the purpose of deciding this question ourselves.


**III**

**Conclusion**

We perceive a clearly reconcilable dichotomy, not a tension, resulting from the distinction between the <u>Maupin</u> and <u>Orkin</u> lines of Texas cases: In the former, the damage-causing acts of the tortfeasor are either actually or legally deemed to be

---

[43]614 S.W.2d 847 (Tex. App. —— Texarkana), writ ref'd n.r.e., 621 S.W.2d 596 (1981).

[44]<u>Id.</u> at 850.

20

intentionally harmful; in the latter, the acts that are performed intentionally are not intended to cause harm but do so as the result of negligent performance of those acts. As in the instant case, both types of tortious acts frequently occur in the performance of a contract; the difference lies in the way that the obligor performs. An obligor who intends his performance to result in damage —— or, one who commits an act that is legally deemed to constitute an intentional tort —— is a <u>Maupin</u> tortfeasor. On the other hand, an obligor who intends his performance to be correct, but who negligently falls short of the appropriate standard and causes unintentional damage, is an <u>Orkin</u> tortfeasor. Had the only allegations against GEI accused it of knowingly and willfully choosing and using the substandard material that damaged the paving, and doing so to cut corners or gain unearned profit, GEI would be a <u>Maupin</u> tortfeasor. As T&S's allegations against GEI include negligence, however, GEI is an <u>Orkin</u> tortfeasor.

GEI adduced sufficient summary judgment evidence to show that T&S's complaint contains allegations of property damage caused by an accident and thus, under the policy, by an "occurrence." This shifted the burden to Maryland to show that one or more its policy exclusions apply, and Maryland failed to meet that burden. Thus Maryland has a duty to defend GEI in the underlying suit. Accordingly, we (1) reverse the district court's grant of summary judgment in favor of Maryland; (2) render summary judgment in favor of Grapevine; (3) remand the case for the district court to admit

21

and consider evidence regarding the damages that GEI incurred as a result of Maryland's breach, and to fashion an appropriate remedy; and (4) retain jurisdiction for the limited purpose of determining whether GEI is entitled to recover attorney's fees incurred in pursuing this action.

REVERSED, RENDERED in part, and REMANDED in part; limited jurisdiction retained for future determination whether Appellant is entitled to attorney's fees.